IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case Number 00-6211 CR-DTKH

UNITED STATES OF AMERICA, )
　)
　　　Plaintiff, )
　) ***DEFENDANT NABIL AQUIL'S MOTION***
vs. ) ***FOR JUDGMENT OF ACQUITTAL***
　) ***PURSUANT TO FED. R. CRIM. P. 29(a)***
NABIL AQUIL, )
　)
　　　Defendant. )
　)

NOW COMES the Defendant, NABIL AQUIL, by and through his attorneys, LAW OFFICES OF PAUL GOODMAN, and moving for a judgment of acquittal pursuant to Fed. R. Crim. 29(a) states as follows:

### Introduction

Aquil is currently charged with the following two offenses in a multi-count, multi-defendant indictment:

    a.  Count I: 21 U.S.C. §§841(c)(2) and 846 (conspiracy to possess pseudophedrine knowing or having reasonable cause to believe that the listed chemical would be used to manufacture methamphetamine); and

    b.  Count 11: 21 U.S.C. §841(c)(2) (possession of pseudophedrine knowing or having reasonable cause to believe that the listed chemical would be used to manufacture methamphetamine).

The matter proceeded to trial. After three and a half days of jury selection, the Government opened its case-in-chief. Even after presenting the testimony of numerous witnesses over the span of thirteen court days, the Government has failed, both legally and factually, to sustain its charges against Aquil.



## *Legal Standard*

The Federal Rules of Criminal Procedure provide that the court, "on motion of a defendant of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Fed. R. Crim. P. 29(a). When considering a motion for judgment of acquittal, the court should evaluate the evidence in the light most favorable to the government and only enter judgment of acquittal for the defendant if the evidence does not establish each element of the offense charged beyond a reasonable doubt.

## *Argument*

Aquil's first challenge is that 21 U.S.C. §846, the conspiracy statute pursuant to which Aquil was charged, is void for vagueness as it is applied to him. Next, Aquil argues that the Government has failed to present sufficient evidence to establish his guilt of both the conspiracy charge and the underlying substantive offense beyond a reasonable doubt.

**A.    *Count I: Conspiracy – 21 U.S.C. §§841(c)(2) and 846.***

In this case, the Government charged Aquil with conspiracy under 21 U.S.C. §846. The substantive offense underlying the conspiracy charge is the possession or distribution of a listed chemical under 21 U.S.C. §841(c)(2). However, when §841(c)(2) is the substantive offense underlying a conspiracy charge, §846 becomes unconstitutionally vague because the two sections have conflicting mental state requirements. Regardless, even when considered in the light most favorable to the Government, there is insufficient evidence to sustain the conspiracy charge beyond a reasonable doubt.

### 1. When 21 U.S.C. §841(c)(2) constitutes the underlying substantive offense for a charge of conspiracy, 21 U.S.C. §846 is unconstitutionally vague.

"'Vagueness challenges to statutes...must be examined in the light of the facts of the case at hand.'" *United States v. Carlson*, 87 F.3d 440, 443 (11th Cir. 1996), quoting *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714 (1975). "'[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Joel v. City of Orlando*, 232 F.3d 1353, 1360 (11th Cir. 2000), quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858 (1983).

An essential element of a conspiracy charged under §846 is that a defendant had knowledge of the conspiracy's essential objective and knowingly and voluntarily participated in the conspiracy. *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994). The government must also prove he had a "deliberate, knowing, specific intent to join the conspiracy." *United States v. Adkinson*, 158 F.3d 1147, 1153 (11th Cir. 1998), quoting *United States v. Cole*, 755 F.2d 748, 755 (11th Cir. 1985). *See also United States v. Calderon*, 169 F.3d 718, 723 (11th Cir. 1999) ("one must have knowledge of such conspiracy and must intend to join or associate [himself] with the objective of the conspiracy.").

In this case, the substantive offense underlying the conspiracy charge is §841(c)(2), which provides that it is unlawful for any person to "knowingly or intentionally" possess or distribute a listed chemical "knowing, or having reasonable cause to believe" that the listed chemical will be used to manufacture a controlled substance. 21 U.S.C. §841(c)(2). To sustain a conviction under this section, the government must prove beyond a reasonable doubt that the defendant: (1) knowingly

or intentionally possessed or distributed a listed chemical, (2) knowing or having reasonable cause to believe that the listed chemical would be used to manufacture a controlled substance. *See, e.g., United States v. Day*, 223 F.3d 1225, 1229 (10th Cir. 2000) (emphasis added).

The mental states for §841(c)(2) and §846 are clearly in conflict. Normally, the government can only obtain a conviction for conspiracy by proving that a defendant had *knowledge* of the alleged conspiracy's unlawful objective and *knowingly, deliberately and intentionally* joined with the objective of that conspiracy. However, §841(c)(2)'s relaxed mental state merely requires that a defendant have *reasonable cause to believe* that the listed chemical would be used to manufacture a controlled substance. Therefore, when §841(c)(2) is the substantive offense underlying a conspiracy charge, the government's burden for a conspiracy conviction lowers to only proof that a defendant had reasonable cause to believe that the conspiracy's objective was unlawful.

This lessening of the mental state required for a conspiracy conviction renders it impossible for an ordinary person to know in advance what conduct is prohibited by the conspiracy statute. Need a defendant know about the agreement's unlawful objective or merely have reasonable cause to know of that objective? Nor is law enforcement provided any guidance regarding what is and what is not lawful or unlawful conduct.

Based upon the foregoing, any conviction of Aquil for conspiracy relying solely upon the "reasonable cause to believe" standard articulated in §841(c)(2) would have to be the result of an unconstitutionally vague application of §846. Accordingly, for Aquil to be convicted for conspiracy under §846, this Court should require that the objective of the conspiracy be the knowing and intentional possession of pseudophedrine with *knowledge* that it will be used to manufacture methamphetamine. Anything less would be unconstitutional.

### 2. The Government has failed to sustain its burden of proving a violation of 21 U.S.C. §846 beyond a reasonable doubt.

To convict a defendant of conspiracy under §846, the government must prove beyond a reasonable doubt that: (1) an agreement existed to achieve an unlawful objective; (2) the defendant knew of the agreement and its unlawful objective; and (3) the defendant knowingly and voluntarily participated in the agreement. *See, e.g., Harris*, 20 F.3d at 452. The "agreement remains the essential element of the crime [of conspiracy]." *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1290 (1975). Even though the government need not present proof of a formal agreement, the government must still prove "a meeting of the minds to commit an unlawful act." *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) (citations omitted).

Not only must the government prove a conspiratorial agreement, the government must also prove beyond a reasonable doubt that a defendant deliberately, knowingly and with specific intent joined or associated himself with that agreement's unlawful objective. *Calderon*, 169 F.3d at 723; *Adkinson*, 158 F.3d at 1153. "A conspirator 'must promote [the] venture itself, make it his own, have a stake in the outcome.'" *United States v. Knowles*, 66 F.3d 1146, 1155 (11 Cir. 1995), quoting *United States v. Falcone*, 109 F.2d 579, 581 (2nd Cir. 1940).

Evidence that a defendant knows of a conspiracy does not itself establish that the defendant joined the conspiracy. *See, e.g., United States v. Mollier*, 853 F.3d 1169, 1172-1174 (5th Cir. 1988). *See also United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000) ("*Knowing* of a conspiracy differs from *joining* a conspiracy"). It is not sufficient that a defendant merely knew that a conspiracy existed, approved of the conspiracy, associated himself with conspirators, had a close, personal relationship with conspirators or was present during conspiratorial activities.

*See, e.g., United States v. Diaz*, 248 F.3d 1065, 1093 (11th Cir. 2001); *United States v. Morgano*, 39 F.3d 1358, 1377 (7th Cir. 1994).[1] Conspiracy simply requires "more than suspicion, more than knowledge, acquiescence, carelessness, indifference, [or] lack of concern." *Direct Sales v. United States*, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270 (1943). Rather, conspiracy requires that there be "informed, interested cooperation, stimulation, instigation...[and] also a 'stake in the venture.'" *Direct Sales*, 319 U.S. at 713, 63 S.Ct. at 1270 (1943).[2]

---

[1] *See also United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001) (innocent association, even if it is knowing, does not amount to a "slight connection" although one is acquainted with criminals, physically present when they are committing crimes or even living in the same house as the criminals). *United States v. Lopez-Ramirez*, 68 F.3d 438, 440 (11th Cir. 1995) (participation not established merely by defendant's association with conspirator or presence in car allegedly engaged in counter-surveillance maneuvers); *United States v. Knox*, 68 F.3d 990, 995 (7th Cir. 1995) (mere association with conspirators, knowledge of conspiracy and presence during conspiratorial discussions insufficient for conspiracy); *United States v. Perez-Tosta*, 36 F.3d 1552, 1557 (11th Cir. 1994) (evidence insufficient for conspiracy even though defendant provided keys, registration and insurance for vehicle used to transport the drugs and later was present in vehicle when it was engaged in counter-surveillance); *United States v. Stanley*, 24 F.3d 1314, 1321 (11th Cir. 1994) (defendant's presence in vehicle where drugs were stored, even while driver and another passenger were negotiating the sale of cocaine within earshot, insufficient for conspiracy and possession); *United States v. Thomas*, 8 F.3d 1552, 1558 (11th Cir. 1993) (defendant's presence with conspirators alone or close association with them insufficient proof of participation in conspiracy); *United States v. Hernandez*, 896 F.2d 513, 519 (11th Cir. 1990) (defendant's association with co-defendant insufficient for conspiracy and possession even though defendant was in vehicle from which drugs were retrieved and present when drugs given to undercover agent).

[2] As one Appellate Court queried:

(1) Did the defendant supply the commodity in question with "knowledge, [but] acquiescence, carelessness, indifference, lack of concern" for the drug business he was aiding (in which case there was no agreement and intent to join a conspiracy)? or

(2) Did the defendant help an alleged co-conspirator with "informed and interested cooperation, stimulation [and] instigation" in the alleged conspiracy (in which there would be agreement and intent to join the conspiracy)?

*See United States v. Mollier*, 853 F.2d 1169, 1173 (5th Cir. 1988).

In *Adkinson*, the defendants were charged with conspiring to commit tax evasion. The government argued that its evidence – records showing various payments to the defendants were not reported to the IRS or reported on their income tax returns – permitted the jury to infer the requisite agreement to impede the Internal Revenue Service. The Appellate Court, however, found that the evidence, at most, implied separate purposes to evade taxes but did not support an inference that each alleged tax evader ever *knew* of the others' tax evasion, much less any agreement to do so. Using language similar to that in contract law, the Appellate Court held that the government failed to show circumstances from which a jury could infer beyond a reasonable doubt that there was a "meeting of the minds to commit an unlawful act." *Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998), quoting *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988):

> The appellants certainly directed their efforts toward the common goal of making money for themselves...But to support a conspiracy conviction, the evidence must establish a common agreement to violate the law. While the evidence clearly shows that the law was violated, there is insufficient evidence of a common agreement. Without evidence showing or tending to show a meeting of the minds to commit an unlawful act, the convictions [for conspiracy] cannot stand.

*Adkinson*, 158 F.3d at 1154, quoting *Parker*, 839 F.2d at 1478.

Another case demonstrating the extent to which the government must prove knowledge is *United States v. Bautista-Avila*, 6 F.3d 1360 (9th Cir. 1993). Two defendants drove into the United States from Mexico one minute after a Ford containing cocaine and parked at a motel next to the Ford. A conspirator retrieved the Ford's keys from the room in which the defendants were staying. One conspirator later confessed that both cars were involved in the conspiracy and that he had given one defendant $5,000.00 cash which was hidden in his car. Although acknowledging that the defendants' behavior was "consistent with that of people tangentially involved in a drug conspiracy",

the Appellate Court overturned the defendants' conviction because the behavior was also "consistent with that of people who are unwittingly associating with individuals in a drug conspiracy." The Appellate Court further noted that the defendants' handling of the $5,000.00 was not sufficient as there was no evidence that they knew the money was involved in a drug conspiracy especially since one defendant said that he entered the United States to buy a truck. *Bautista-Avila*, 6 F.3d at 1363.

"Once the government establishes the existence of the underlying conspiracy,...it only needs to come forward with slight evidence to connect a particular defendant to the conspiracy." *Harris*, 20 F.3d at 452. Even so, the government must still demonstrate with *substantial* proof there was, in fact, some connection between the defendant and the conspiracy. *Adkinson*, 158 F.3d at 1152, citing *Toler*, 144 F.3d at 1426-1428. As stated in *Adkinson*:

> [E]ven when appropriately invoked, the looseness and pliability of the [conspiracy] doctrine present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case. [A court should not strain] to uphold any conspiracy conviction where prosecution for the substantive offense is adequate and the purpose served by adding the conspiracy charge seems chiefly to get procedural advantages to ease the way to conviction.

*Adkinson*, 158 F.3d at 1153, quoting *Krulewitch v. United States*, 336 U.S. 440, 449, 457, 69 S.Ct. 716 (1949) (Jackson, J. concurring).

The "slight evidence" rule is often misunderstood and misapplied.[3] To the extent the rule suggests a conviction can be obtained by less than evidence of guilt beyond a reasonable doubt, this would be contrary to the long-established principle that all criminal convictions must be proved by

---

[3]In fact, it has been noted that "[t]he 'slight evidence' rule as used and applied on appeal in conspiracy cases since 1969 should not have been allowed to worm its way into the jurisprudence of [this] Circuit. It is accordingly *banished* as to all appeals hereafter to be decided by this Court." *United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979).

"evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Toler*, 144 F.3d at 1427, quoting *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787 (1979). To be constitutional, therefore, the phrase "slight evidence" must be interpreted "to refer not to the quantum of evidence necessary to support a conspiracy conviction but, instead, to the extent of a defendant's connection to the conspiracy or to the other conspirators." *Toler*, 144 F.3d at 1427.[4] The foregoing takes heightened importance when alleged co-conspirators are tried together. *See, e.g., United States v. Glinton*, 154 F.3d 1245, 1250 (11th Cir. 1998). *See also United States v. Gaviria*, 116 F.3d 1498, 1533 (D.C. Cir. 1997), cert. denied 118 S.Ct. 865, 1086 (1998) (risk of "spillover prejudice" may occur when a jury imputes evidence from one conspiracy to a defendant involved in a separate conspiracy).

Another case worthy of note is *United States v. Estrada-Macias*, 218 F.3d 1064 (9th Cir. 2000). Estrada was convicted of conspiracy on evidence that he was with alleged conspirators within two hours after each had received a delivery of pills, even though he was not present when the shipments were received. Estrada also lived in a trailer next to the residence used by the conspirators for the manufacture of methamphetamine and several items related to the manufacture were found in his trailer. The conspirators located in the house next to Estrada's trailer had access to the trailer and, in fact, were seen frequently entering the trailer and its garage. Finally, Estrada initially stated that he did not live at, but visited, the trailer, but then admitted he had lived there the past three months.

---

[4]For example, a defendant may be found guilty even if his contact extends to only one or a few of a large number of co-conspirators so long as the agreement, with its concomitant knowledge of the general scope and purpose of the conspiracy and the defendant's intent to participate in achieving its illegal ends, is proven beyond a reasonable doubt. *Toler*, 144 F.3d at 1427-1428. Likewise, a defendant can be convicted even if his or her participation in the scheme is "slight" by comparison to the actions of other co-conspirators. *Toler*, 144 F.3d at 1428.

The Appellate Court reversed Estrada's conviction even though the evidence was "certainly sufficient" to raise a strong inference that Estrada must have known that several individuals living around him were engaged in a conspiracy to manufacture methamphetamine:

> "Mere casual association with conspiring people is not enough." [citation omitted]. As the [circuit] court correctly told Estrada's jury:
>
>> Merely being present at the scene of the crime or merely knowing that a crime is being committed or is about to be committed is not sufficient conduct to find that a defendant committed that crime. In order to find the defendant guilty of he crime, the government must prove, beyond a reasonable doubt, that in addition to being present or knowing about the crime, the defendants knowingly associated themselves with the crime in some way as participants – persons who wanted the crime to be committed – not as mere spectators.
>
> No rational trier of fact could find that this standard was met for Estrada. [footnote omitted]. The record is barren of evidence that he *participated* in the conspiracy. No one testified he was involved. Estrada was never seen with the ingredients or with the finished product of methamphetamine. He was not present at the delivery of the ten-case shipment of pills and there was no evidence that he was presnet at the five-case delivery. When he was found in vehicles with some of the conspirators, there is no evidence that there were drugs or precursors in those vehicles at the time. There was no evidence, such as fingerprints, connecting him to the containers found in the trailer. There was no evidence that he remained control over his quarters; indeed, there was contrary evidence that the residence of the house frequently entered the trailer. There is no evidence that he had any interest in the house; no utility bills, no written statements...
>
> Under our precedent, Estrada's conviction cannot stand. A comparable case is *United States v. Vasquez-Chan*, 978 F.2d 546 (9th Cir. 1999)...[In *Vasquez-Chan*], we held that neither defendant could stand convicted of either possession...or conspiracy to possess cocaine. "While the government submitted more than enough evidence that a narcotics conspiracy existed among several individuals *other* than Gaxiola and Vasquez, the evidence does not establish that the defendants here agreed to or knowingly assisted that conspiracy [citation omitted]."...The same can be said about Estrada.

*Estrada-Macias*, 218 F.3d at 1064.

Based upon the Government's evidence in this case, no jury could find, beyond a reasonable doubt, that Aquil knew of either the alleged conspiracy or its alleged unlawful objective. The Government contends the alleged conspiracy concerning the pseudophedrine commenced in or about April of 1999 and continued through August of 2000. The conspiracy was centered in southern Florida and specifically at a Shurgard public storage facility. However, the Government presented no evidence that Aquil was ever at Shurgard or even knew of Shurgard. The Government presented evidence of numerous shipments of pseudophedrine received by Defendant Tom Narog and his company, Seaside Pharmeceuticals. However, the Government presented no evidence that Aquil ever knew or met Tom Narog. Nor did the Government present evidence that Aquil was ever present or knew of the pseudophedrine shipments to Shurgard. Finally, the Government never presented any evidence that Aquil knew that any of the pseudophedrine was shipped or being shipped to California, whether for legitimate or illegitimate purposes.

Instead, the Government's paucity of evidence against Aquil is limited to the following:

    a.    On June 1, 2000, Agent Randerson observed Aquil at Boston's restaurant with Ghandi Jaber, Raed Aldin, Motlaq Jaber and three others unidentified individuals eating, drinking and engaging in conversation. Agent Randerson acknowledged that he was not close enough to the table and was therefor unable to hear any of the conversation between the parties.

    b.    On June 2, 2000 at about 12:30 p.m., Agent Baker saw Aquil leave 704 North Broughton Circle, Boynton Beach, Florida ("704 Broughton") in a white Cadillac with one unidentified male. Neither Aquil or the unidentified male were carrying anything of evidentiary value and were therefor not followed.[5]

---

[5] Various DEA agents testified that between June 1 and 5, 2000, they believed pseudophedrine was being stored and repackaged at 704 Broughton. Also during this time, DEA agents observed several individuals – including Aldin, Motlaq Jaber and others who remain unidentified – entering and exiting 704 Broughton several times a day. There is no testimony, however, that Aquil knew or participated in this activity.

-11-

c.  On June 3, 2000 at about 3:30 p.m., Agent Baker saw Aquil, Fneiche, Aldin and one unidentified individual leave 704 Broughton in the Cadillac and return about two and a half hours later. None of the individuals were carrying anything of evidentiary value and were therefor not followed.

d.  On June 4, 2000 at about 10:30 a.m., Agent Baker saw Aquil leave 704 Broughton in the white Cadillac and return fifteen minutes later. He was not followed.

e.  On June 4, 2000, Agent Randerson observed Aquil standing near the rear of a white Cadillac backed into the garage at 704 Broughton. At this time, Aldin and Fneiche placed several large trash bags into the car. Aquil was not observed touching any of the trash bags. After several minutes, Aldin and Fneiche drove off leaving Aquil behind at the apartment.[6]

f.  On June 5, 2000, Boynton Beach Crime Specialist Michael Hall lifted a latent fingerprint from a taped box at 704 Broughton. Although the fingerprint belonged to Aquil, there was no testimony concerning the type or contents of the box. As a result, all the fingerprint accomplishes is confirming the already known fact that Aquil was at sometime present at 704 Broughton.

g.  After being stopped and interrogated on June 5, 2000, Aquil informed DEA agents that he had never been to 704 Broughton. Nonetheless, he then voluntarily accompanied agents to the apartment while the agents executed a search warrant on the premises.

None of this evidence, regardless of the credibility ascribed to it, proves that Aquil knew of the alleged conspiracy or the alleged conspiracy's unlawful objective. Aquil's dinner with possible conspirators means nothing as there is no evidence they discussed, let alone mentioned, the

---

[6]Agent Baker took pictures of the Cadillac and Aldin at this time. However, none of the pictures depict either Aquil or Fneiche. Further, Agent Baker prepared a report which described the events related by Agent Randerson. By the time this report was finalized, Agent Randerson and the other agents had already "unequivocally" determined Aquil's identity (the report actually mentions Aquil's name in regard to unrelated activity). However, the report – which Agent Randerson read, approved and signed – referred only to "several unidentified individuals." It was not until trial that Agent Randerson revealed that Aquil was one of the "several unidentified individuals." Ironically, Agent Baker testified that he was alone "99% of the time" during his surveillance of 704 NBC, placing in substantial doubt whether Agent Randerson was even there at the time he claims to have made his observations.

pseudophedrine. *See, e.g., Diaz,* 248 F.3d at 1093. The Government's evidence concerning 704 Broughton only establishes Aquil's presence at a place where pseudophedrine was being stored and repackaged.[7] *See, e.g., Diaz,* 248 F.3d at 1093. Finally, any evidence related to the Cadillac alone, without specific identification of Aquil as a driver or passenger, has little or no evidentiary value given both Agent Baker and Agent Randerson's admission that others beside Aquil used the Cadillac.

On the other hand, there is ample evidence to establish that the suspected co-conspirators went to great lengths to either shield or dupe Aquil, and many others, regarding the objectives of the alleged conspiracy. Suspected co-conspirators took substantial steps to create an air of legitimacy about the handling and distribution of the pseudophedrine, an otherwise legal chemical used for cold medicine and sold over the counter and neighborhood drug stores. To buttress the air of legitimacy, those involved often referred to the distributor license that Tom Narog and Seaside Pharmaceuticals obtained from the DEA. Documents were also prepared and circulated to fool some of those handling the pseudophedrine that it was being lawfully exported to a company in Israel.

The Government relies heavily on inconsistent or contrary statements Aquil gave to DEA agents after his traffic stop on June 5, 2000. At that time, Aquil was driving a white Cadillac with Fneiche as his passenger when a Boynton Beach police officer initiated a traffic stop at the direction of DEA agents in a Target parking lot not far from 704 North Broughton Circle.[8] Immediately subsequent

---

[7]DEA agents conducting surveillance *outside* of 704 Broughton can only confirm Aquil's presence in the apartment between June 1, 2000 and June 4, 2000. DEA agents never got inside 704 Broughton until June 5, 2000, two days after Aquil was last seen entering the apartment. DEA agents were unable to testify concerning what occurred *inside* 704 Broughton including anything Aquil may or may not have seen or done while he was there.

[8]It is worthy of note that at the time of the stop, Aquil was obeying all traffic laws.

to the stop, as many as twelve law enforcement officers descended upon the scene in as many as seven vehicles.[9] The agents initiated questioning of Aquil and Fneiche as well as Aldin (who had also been stopped in his Pontiac Sunbird), searched both vehicles and took pictures of Aquil, Fneiche, Aldin and their vehicles. The agents then escorted Aquil, Fneiche and Aldin to 704 North Broughton Circle (who went voluntarily) where the agents executed a search warrant and seized numerous boxes of pseudophedrine. As Aquil was breaking no traffic laws when he was stopped, it is no wonder he was defensive when so many law enforcement officers swooped down on him, read him his *Miranda* warning and commenced interrogating him.[10]

Agent O'Connor also testified that during questioning, Aquil advised that he was staying in a hotel on the beach with Fneiche but did not know the name or location. That a visitor to a strange city might not remember the name of his hotel or be able to describe its location is understandable.

---

[9] Agent Randerson testified that when he arrived at the traffic stop he was upset because he had wanted a "low key" stop, but the scene was anything but low key when he arrived. Agent Randerson testified that there was at least two uniformed officers, ten total law enforcement personnel, two marked police vehicles and at least five total unmarked vehicles.

[10] As the Appellate Court noted in *Estrada-Macias*:
> The government makes much of the fact that Estrada initially denied living in the trailer, although he said that he visited the area; later in the same interview he said that he had lived in the trailer the last three months. The government argues that the initial denial is evidence of guilt. The problem with this argument is that Estrada must have known that a drug manufacturing conspiracy was taking place all around his living quarters. A first instinct to deny residence is not inconsistent with such innocent knowledge, especially when it was quickly corrected. The denial is as consistent with non-participating knowledge as it is with complicity. "When there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one.

*Estrada-Marcias*, 218 F.3d at 1067, quoting *Vasquez-Chan*, 978 F.2d at 549.

In fact, several officers themselves admitted they knew or remembered little about the neighborhood surrounding 704 Brounton and those officers live in southern Florida.[11]

Although to prove conspiracy the Government need not present evidence to exclude every reasonable hypothesis of innocence, a conspiracy conviction cannot be predicated on "conjecture." *Toler*, 144 F.3d at 1433, citing *United States v. Hardy*, 895 F.2d 1331, 1335 (11th Cir. 1990). Where, as here, the Government's case is based on circumstantial evidence, "reasonable inferences, not mere speculation, must support the [conspiracy conviction]." *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001), quoting *Perez-Tosta*, 36 F.3d at 1557. However, that is all the Government has in this case: inferences stacked upon inferences leading to speculation based upon conjecture. The evidence, even when considered in the light most favorable to the Government, is simply insufficient to prove, beyond a reasonable doubt, that Aquil knew or joined any conspiratorial agreement or the unlawful objective thereof or otherwise participated in any conspiracy. Consequently, Aquil is entitled to a judgment of acquittal on the conspiracy charge brought against him pursuant to 21 U.S.C. §846.

**B.   *Count II: Possession – 21 U.S.C. §841(c)(2)***

To sustain a conviction under 21 U.S.C. §841(c)(2), the government must prove that the defendant: (1) knowingly or intentionally possessed or distributed a listed chemical, (2) knowing or having reasonable cause to believe that the listed chemical would be used to manufacture a controlled

---

[11]One officer actually testified that he did not recall that Gateway and Congress were the major streets surrounding 704 Broughton. Another officer testified he did not know that Savannah Lakes was the name of the development where 704 Broughton was located. Other officers testified that they did not know the name of restaurants or other landmarks in the area. And yet they were somehow surprised that Aquil did not recall the name or location of his hotel (although he did say it was near the beach suggesting that he knew how to get there).

substance. *See United States v. Day*, 223 F.3d 1225, 1229 (10th Cir. 2000). The Government has presented no evidence from which any reasonable jury could find either of these elements beyond a reasonable doubt.[12]

The Government has not presented any evidence that Aquil ever had actual possession of any pseudophedrine. None of the DEA surveillance conducted at the location resulted in eyewitness testimony, photographs or video suggesting Aquil ever actually possessed the listed chemical. Clearly, the entire basis for the Government's case is based upon a claim that Aquil was in constructive possession of pseudophedrine because he was present at 704 North Broughton Circle at the same time large quantities of pseudrophedrine were present.[13]

Generally, the government may prove constructive possession if it shows a defendant maintained dominion or control over the contraband or over the premises where the contraband was located. *Harris*, 20 F.3d at 453. *See also United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (holding that exclusive possession of premises supports an inference of constructive possession whereas joint occupancy of a premises cannot sustain such an inference). To prove constructive possession when there is joint occupancy of premises, the government must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband. *Valadez-Gallegos*, 162 F.3d at 1262. The government must

---

[12]Regarding knowledge, Aquil repeats and incorporates his arguments concerning conspiracy as if more fully set forth herein.

[13]The Government did present testimony that DEA agents discovered one fingerprint belonging to Aquil on a sealed box. This does nothing more than confirm an uncontested fact – Aquil was present at 704 North Broughton Circle. It does nothing, however, to suggest that Aquil ever was in actual possession of any pseudophedrine especially since there was no testimony that the box on which the fingerprint was found contained any pseudophedrine.

present "'some evidence supporting at least some plausible inference that the defendant had knowledge of and access to the contraband.'" *Valadez-Gallegos*, 162 F.3d at 1262, quoting *United States v. Taylor*, 113 F.3d 1136, 1144 (10th Cir. 1997), quoting *United States v. Mergerson*, 4 F.3d 337, 349 (5th Cir.), cert. denied 510 U.S. 1198, 114 S.Ct. 1310 (1994).

Like conspiracy, presence and proximity to the alleged narcotics are inadequate to support a conviction for possession. *Valadez-Gallegos*, 162 F.3d at 1262. Neither do conflicting or inconsistent statements taken from a defendant always provide evidence sufficient to show knowledge or constructive possession of drugs. *Valadez-Gallegos*, 162 F.3d at 1262 (defendant's inconsistent and contradictory statements about dates and time of travel, night-time accommodations, weather and presence of another passenger raised only mere suspicion or inference defendant's suspected illegal activity). *See also United States v. Leos-Quijada*, 107 F.3d 786, 795 (10th Cir. 1997) (inconsistent stories about travel plans insufficient to connect defendant with drug venture) and *United States v. Jones*, 44 F.3d 860, 868-869 (10th Cir. 1995) (citing conspiracy cases in which conflicting and implausible stories did not provide sufficient link to contraband or show knowledge of illegal activity).

There is simply no evidence that Aquil ever possessed pseudophedrine, especially that he knowingly or intentionally did so. While there was pseudophedrine located at 704 Broughton, the apartment was not rented to Aquil. In fact, prior to Aquil ever being seen at the apartment, several others had already been observed there. While Aquil did spend some time at the apartment, so did so many others (some identified, others not identified). Aquil neither had exclusive possession of the premises nor is there any nexus linking him to the pseudophedrine, especially given that there was so many unidentified individuals going in and out of the apartment while Aquil was there.

As with conspiracy, the Government's case against Aquil for possession is based only on inferences, speculation and conjecture. Consequently, when the evidence is considered in the light most favorable to the Government, there is simply no way that a reasonable jury could ever find Aquil guilty of possession of pseudophedrine beyond a reasonable doubt. Aquil is thereby entitled to a judgment of acquittal on the conspiracy charge brought against him pursuant to 21 U.S.C. §841(d)(2).

Dated: February 28, 2002

Respectfully submitted,

Paul Goodman
Law Offices of Paul Goodman
Attorneys for the Defendant Nabil Aquil
33 North Dearborn Street - Suite 1015
Chicago, Illinois 60602-3105
Telephone Number: 312-236-3060